IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Julie Andrews, <br><br> Plaintiff, <br><br> vs. <br><br> Linda Gerace, Daniel Gerace, Tiffany Gerace, Charles Olson, Samantha Gerace, Brett Gerace, Kelli Gerace, and Marianne Anderson, <br><br> Defendants. | Case No.: 1:13-CV-01521 <br><br> Hon. James B. Zagel |

## AMENDED COMPLAINT

Plaintiff Julie Andrews ("Plaintiff"), by and through counsel, for her Amended Complaint against Defendants, Linda Gerace, Daniel Gerace, Tiffany Gerace, Charles Olson, Samantha Gerace, Brett Gerace, Kelli Gerace, and Marianne Anderson (collectively, "Defendants"), states as follows:

### INTRODUCTION

1.    This action arises from the long-term, continuing schemes developed by and participated in by Linda Gerace, Daniel Gerace, Tiffany Gerace, Charles Olson, Samantha Gerace, Brett Gerace, Kelli Gerace, and Marianne Anderson (the "Enterprise"), the purpose of which is to benefit and enrich the Enterprise, through improper use of their positions as co-owner (Linda) and employees (remaining Defendants) of two Companies jointly owned by Linda and Julie. Beginning in August 2010 and continuing to the present, Linda, her husband (a former police officer for the City of DeKalb), children, children's boyfriends, accountant friend, and third-party entities with which the Companies do business intentionally and willingly participate in the Enterprise's schemes to accomplish its goals. The Enterprise agreed to and did accomplish its goals by routinely stealing, failing to account for, concealing information concerning,

destroying evidence of, and creating and providing to others fraudulent evidence relating to cash, earnings, profits and other assets which belong to Julie; cooking books, records, and other reports; fraudulently manipulating bank accounts; seeking to intimidate Julie and coerce her to allow the Enterprise to continue its schemes by way of its threats to physically injure and cause additional financial injuries to Julie, as well as its threats to use and actual use of its influence in the community in which the members of the Enterprise live to perpetuate the Enterprise and its illegitimate purposes, such as suing and seeking judicial restrictions and fines on and imprisonment of Julie, accusing Julie of an offense, and threatening to expose Julie to collective hatred, contempt, or ridicule and damage Julie's personal and professional relationships.

## Jurisdiction and Venue

2.    This Court has jurisdiction because this action arises in part under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.*

3.    The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

4.    This Court also has original jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(2), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because a substantial portion of the transactions and conduct giving rise to this lawsuit occurred within Kane County, a county within the Eastern Division of the Northern District of Illinois.

## The Parties

6.    Plaintiff, Julie Andrews ("Julie"), is an individual residing in Boca Raton, Florida.

7.    Defendant, Linda Gerace ("Linda"), is an individual residing in DeKalb, Illinois.

8.      Defendant, Daniel Gerace ("Dan"), is an individual residing in DeKalb, Illinois.

9.      Defendant, Tiffany Gerace ("Tiffany"), is an individual residing in Kingston, Illinois.

10.     Defendant, Charles Olson ("Charles" or "Charlie"), is an individual residing in Kingston, Illinois.

11.     Defendant, Samantha Gerace ("Samantha" or "Sam"), is an individual residing in DeKalb, Illinois.

12.     Defendant, Brett Gerace ("Brett"), is an individual residing in DeKalb, Illinois.

13.     Defendant, Kelli Gerace ("Kelli"), is an individual residing in DeKalb, Illinois.

14.     Defendant, Marianne Anderson ("Marianne"), is an individual residing in DeKalb, Illinois.

### Allegations Common to All Counts

15.     Before July 30, 2010, Linda, Daniel, Tiffany, Charlie, Sam, Brett, Kelli, and Marianne knowingly, willingly, and intentionally formed the Enterprise, an association in fact dedicated to the repeated commission of predicate acts and criminal offenses.

16.     In furtherance of the Enterprise's schemes, on July 30, 2010, Linda agreed with Julie to and each did become 50% co-owners of Winners Circle & Associates ("WCA") and Sycamore Speedway & Associates ("SSA"). WCA and SSA are referred to herein collectively as the "Companies."

17.     In furtherance of the Enterprise's schemes, Linda agreed with Julie that the Companies would be managed and operated fairly between them and that they would split equally all profits of the Companies.

18.     On and before July 30, 2010, Linda intended to participate in and perpetuate the Enterprise and its illegitimate goals.

3

19.   Julie was not aware of the Enterprise or Linda's secret intentions.

20.   Linda and Julie did not discuss or otherwise reach any agreement regarding the Enterprise or Linda's ability to participate in the schemes and misconduct of the illegitimate Enterprise.

21.   At the time Julie and Linda purchased the Companies, the Companies had nearly $175,000 in bank accounts at American Midwest Bank, that is, Checking: $80,338; Savings: $61,560; CD: $30,990; and ATM: $1,669.87.

22.   The real estate owned and operated by the Companies are located in Maple Park, Kane County, Illinois.

23.   WCA is a bar and restaurant located in Maple Park in the business of selling beer, liquor, and food.

24.   WCA advertises and is accessible on the worldwide web at www.sycamorespeedway.com, including at http://www.sycamorespeedway.com/home-page-banners/winnerscircle.aspx.

25.   Nearly all payments received by WCA for its goods and services are made to WCA in the form of cash. WCA does not accept payment by credit card and only rarely accepts payment by check.

26.   SSA is a race track located in Maple Park in the business of selling admission tickets to access to a clay race track used for sport and/or entertainment events, such as automobile racing.

27.   The automobile events at the SSA are referred to as "Race Nights." SSA puts on forty Race Nights each year, on Fridays and Saturdays, from May through September.

28.     Among other things, SSA sells admission tickets, pit passes, food, beer, liquor, souvenirs, tires, and cars at the track. SSA also sells demolished or junked automobiles for parts or other purposes to businesses such as Zimmerman Scrap, Inc. and Paul's Junk Yard.

29.     SSA advertises and is accessible on the worldwide web at www.sycamorespeedway.com

30.     SSA sells its goods and services at its property in Maple Park, Illinois.

31.     There are different buildings, structures, and areas at the SSA's property in Maple Park, including a building which houses a main ticket booth, an administrative office servicing the Companies and a Money Room where money received throughout the Maple Park property is to be collected and accounted for, a clay race track, two Concession stands, a Souvenir stand, a Beer Wagon stand, and a Pit stand.

32.     In furtherance of its various schemes, the Enterprise conspired to deny Julie any opportunity to discovery the truth.

33.     Beginning in 2010 and continuing to the present, Linda, Tiffany, and Dan conspired to take and have taken control of and sought to deny and have effectively denied Julie all access to cash, profits, the Money Room, and all books, records, reports, financial documents and other evidence which would reveal to Julie some of the schemes of the Enterprise and the exact values of the property stolen from Julie.

34.     For example, in or about August 2010, Linda and Tiffany caused the locks to be changed otherwise permitting access to the Money Room and other property to be changed in order to and did prevent Julie's accesses.

35.     From that date to the present, Linda has refused to provide Julie with a key to the Money Room.

36. Thereafter, as an essential part of its execution of different preconceived schemes to steal and defraud, the Enterprise uses the mail and wire to transmit fraudulent documents relating to money and other property belonging to Julie.

37. During the week when Race Nights are not taking place, SSA accepts from various vendors at its Maple Park property delivery of goods for use and resale, such as food, beverages, and tires. Most of the goods are delivered COD or Charge on Delivery. SSA customarily pays for the goods at the administrative office at its Maple Park property.

38. Since August 2010, amounts the Companies owe any of their vendors or service providers have been and are timely paid.

39. Nearly all payments received by SSA for its sales of goods and services are made to SSA in the form of cash. SSA does not accept payment by credit card and only rarely accepts payment by check.

40. At the various stands on the Maple Park property, the cash paid in exchange for the Companies' goods and services are to be put into "Money Cans."

41. The Companies' policies require that, periodically during each Race Night, all cash and other payments made in exchange for the Companies' goods and service are to be delivered or otherwise provided to the person in charge of the Money Room.

42. In the Money Room, the cash is to be counted, bundled, and prepared for deposit into the Companies' bank accounts at American Midwest Bank.

43. At around 9:00 pm on each Race Night, the Companies are to place into a deposit bag for prompt deposit at American Midwest Bank all of the cash and other payments made in exchange for the Companies' goods and service between 5:00 p.m. and 9:00 p.m.

44.     The Companies give the deposit bag containing the money to Dan, and Dan is to deliver the deposit bag to American Midwest Bank each Race Night.

45.     After the deposit bag is prepared each Race Night, the Companies continue to receive payments for goods and services. The amounts collected between around 9:00 p.m. and midnight each Race Night are referred to as "End-of-Night" money. At the close of business each Race Night, the End-of-Night money is to be collected. The morning after each Race Night, the End-of-Night money is to be deposited at American Midwest Bank.

46.     Beginning in August 2010, Tiffany and Linda took and continue to take from the Maple Park property the End-of-Night payments made in exchange for the Companies' goods and services.

47.     The morning after each Race Night, the Company is to go to American Midwest Bank. There, the prior night's deposit bag is to be picked up. The amount of money in the deposit bag is to be added to the End-of-Night money, and the total amount collected on the prior Race Night calculated and documented.

48.     Beginning in August 2010, Linda, Dan, and Tiffany took and continue to take charge of collecting and depositing End-of-Night money each Race Night

49.     Beginning in August 2010, Tiffany and Linda took and continue to take charge calculating and documenting their calculations of the total amounts collected each Race Night.

### *Linda Gerace*

50.     In furtherance of the Enterprise's schemes, Linda places herself in a role such that she is partially responsible for the day-to-day operations of the Companies.

51.     Linda is also partially responsible for the day-to-day operations of the Enterprise, including developing illegal schemes, instructing other members of the Enterprise how to execute various schemes, and communicating with Julie.

52.     From April through August 2010, in furtherance of the Enterprise's schemes to steal and conceal from and deceive Julie, Linda communicated with Julie about the operations, finances, and other matters relating to the Companies and money and other property belonging to Julie via electronic mail, telephone, and facsimile, telling Julie, among other things, the amounts of money that would be transmitted from Illinois to Julie in Florida. Thereafter, Julie continued to call, email, and text Linda about the same topics.  Linda often refused to respond to Julie or give her the information she requested.

53.     From at least August 2010, Linda has stolen and continues to steal and misappropriate money and other property derived from SSA and WCA and belonging to Julie in the form of cash and other assets.

54.     From at least August 2010, Linda has had and continues to have access to the credit, bank, and other third-party accounts of SSA and WCA which, from time to time, contain property belonging to Julie.

55.     Linda has caused credit, bank, and other-third parties to deny Julie access to accounts of SSA and WCA which, from time to time, contain property belonging to Julie.

56.     As of January 31, 2013, the Companies have less than $45,000 in bank accounts at American Midwest Bank, that is Checking $3357.39; Saving $40,027.08; CD $0.00; and ATM: $1,089.64.

57.     From at least August 2010, Linda has had and continues to have access to the money and other property derived from the Companies in the form of cash and other assets, such

as motor vehicles, parts, equipment, computers, food, beverages, books, records, reports, documentation, and other information at or derived from the Companies. A portion of the foregoing and/or their value belong to Julie.

58. From at least August 2010, Linda has had and continues to have control over the manner in which the books, records, reports, and documentation relating to SSA and WCA and the money and other property belonging to Julie are prepared, maintained, stored, transmitted, and communicated to Julie and third parties.

59. While working at the Companies, Linda collected cash payments from customers in exchange for tickets, food, beer, liquor, souvenirs, pit passes, tires, and cars at the track.

60. Periodically during and at the close of each Race Night, Linda is to provide or deliver to the Money Room or the person in charge of the Money Room all cash and others of payment made for the Companies' goods and services.

61. Linda and Tiffany have taken control charge of the Money Room.

62. While working as a co-owner and an employee of the Companies, at the close of business, and at other times, Linda acts on behalf of the Enterprise, taking, misappropriating, and converting cash paid in exchange for the Companies' goods and services for the enrichment of the Enterprise.

63. For example, every Race Night since August 1, 2010, while working as a co-owner and an employee of the Companies but acting on behalf of the Enterprise, Linda takes possession and control of thousands of dollars of cash paid in exchange for the Companies' goods and services, including all cash paid taken in at the Beer Wagon and Money Cans at the Beer Wagon stand, Concession stands, Souvenir stand, and elsewhere.

64.     Linda does not deliver to the Money Room any of the End-of-Night money or Money Cans from the Race Nights, amounting to thousands of dollars a night.  On behalf of the Enterprise, Linda takes possession and control of the property for the enrichment of the Enterprise.

65.     An an example of the Enterprise's regular way of doing business, in or about August 10 and 11, 2012, Linda stole property Money Cans full of cash, drove a golf cart out of the Companies' gates, and placed the Money Cans into her car for the exclusive use of the Enterprise.  Linda repeats this conduct on behalf of the Enterprise each Race Night.

66.     In that way, Linda executes the Enterprise's schemes to steal, as well as conceal its theft.  Linda prevents thousands of dollars of earnings and profits from being accounted for by the Companies each Race Night.

67.     Since August 1, 2010, Linda uses company lines of credit and/or credit cards and the benefits thereof for the exclusive use of the Enterprise.

68.     For example, in or about August 2010, the Companies obtained a Southwest Airlines Visa credit card ("SWA Visa") from Visa in the name of SSA.  Though Linda told Julie the card would be used for purposes of Julie's travel on behalf of the Companies, Linda intended to and did use the SWA for the exclusive benefit of the Enterprise, including to obtain airline tickets, food, car rental, services at a nails salon, and other goods and services benefitting the Enterprise.

69.     For example, on or about January 12, 2012, Linda charged in excess of $1500 on the SWA Visa for non-Company travel to Arizona for members of the Enterprise.

70.     As another example, in furtherance of the Enterprise's scheme to use the SWA Visa for its exclusive benefit, Linda and Tiffany caused American Midwest Bank to issue a

check from the Companies' accounts to pay the SWA Visa charges, including the charges the Enterprise made for non-Company purposes.

71.    Linda willingly and knowingly has used and continues to use stolen money to fund the lifestyle of the members of the Enterprise.

72.    For example, on or about July 8, 2011, acting on behalf of the Enterprise, Linda hired Whitman's Catering for Kelli's high school graduation party, held at Linda's home on July 10, 2010. In furtherance of the Enterprise's scheme to convert stolen property for its entertainment on July 10, 2010, Linda caused a check dated July 8, 2011 in the amount of $1678 to be drawn on SSA's accounts and paid to Whitman's Catering.

73.    For example, as part of an Enterprise scheme in or about December 2012, Linda converted stolen profits to multiple 52 inch and 60 inch screen televisions, iPods, and other electronics from Wal-Mart. Linda gave the items to other members of the Enterprise, including Tiffany, Samantha, Brett, and Kelli.

74.    In or about December 2012, Tiffany, Samantha, Brett, and Kelli willingly accepted the items knowing Linda had purchased the items with stolen money.

75.    In 2012, the Enterprise became concerned Julie might discover its theft, fraud, and concealment.

76.    The Enterprise devised a new scheme to conceal its misconduct from Julie.

77.    The Enterprise devised a scheme whereby Dan would take possession of money stolen from Julie by the Enterprise and conceal it in lockers he maintained at a police station or other places where Dan worked.

78.    Since at least August 2010, the Companies have and do make full, complete, and timely payments to the Companies' vendors, employees, and any other creditors.

### *Dan Gerace*

79.     Dan is Linda's husband and the father of Tiffany, Samantha, Brett, and Kelli.

80.     In furtherance of the Enterprise's schemes, Linda hired Dan as an employee of SSA and WCA.

81.     From time to time, Dan is responsible for developing illegal schemes on behalf of the Enterprise.   Dan also knowingly and willingly accepts instructions from Linda and Tiffany and executes schemes on behalf of the Enterprise.

82.     Since August 2010, Dan has access to the profits and other property derived from SSA and WCA and belonging to Julie, including money, motor vehicles, parts, equipment, food, and beverages.

83.     Each Race Night since August 2010, as an employee of the Companies and, concealed from Julie, as a member of the Enterprise, Dan is responsible for collecting from the Money Room, taking possession of, and depositing into the Companies' accounts with American Midwest Bank the deposit bag containing payments made in exchange for the Companies' goods and services, a portion of which belongs to Julie.

84.     In or about June 2012, the Enterprise developed a scheme to intentionally convert stolen funds into a four-wheeler motor vehicle for the exclusive use of the Enterprise.

85.     On June 23, 2012, in furtherance of the Enterprise's preconceived scheme, Linda and Tiffany prepared a check in the amount of $6,500 drawn on SSA's account; they intentionally left the payee blank.  On behalf of the Enterprise, Linda, Tiffany, and Dan used the check to purchase the four-wheeler motor vehicle.  Shortly thereafter, knowing it was purchased with stolen money, Dan willingly accepted possession and use for the Enterprise of the four-wheeler.

### *Tiffany Gerace*

86.     Tiffany is Linda's and Dan's eldest daughter.

87.     In furtherance of the Enterprise's schemes, Linda hired Tiffany as an employee and manager of SSA and WCA.

88.     In furtherance of the Enterprise's schemes, Linda placed Tiffany in a role at the Companies such that Tiffany is partially responsible for the day-to-day operations of the Companies.

89.     Tiffany is also partially responsible for the day-to-day operations of the Enterprise, including communicating with Julie.  Tiffany communicates with Julie in furtherance of the Enterprise's various schemes via telephone, facsimile, United States mail, email, and text.

90.     Tiffany also is responsible for developing, instructing other members of the Enterprise how to execute, executing various illegal schemes on behalf of the Enterprise, and perpetrating, perpetuating, and concealing from Julie different schemes of the Enterprise.

91.     Since at least August 2010, Tiffany has stolen and continues to steal and misappropriate money and other property derived from SSA and WCA and belonging to Julie in the form of cash and other assets.

92.     Since at least August 2010, Tiffany has had and continues to have access to the credit, bank, and other third-party accounts of SSA and WCA which, from time to time, contain property belonging to Julie.

93.     During the week, SSA accepts delivery of goods for use and resale, such as food, beverages, and tires.  SSA customarily makes payment for the goods at the Companies' administrative office in Maple Park.

94.     Since August 2010, Tiffany works in the Companies' administrative office in Maple Park. Tiffany accepts delivery of goods to the Companies and makes payment therefore.

95.     From in or about August 2010, Tiffany has had and continues to have access to the profits and other property derived from SSA and WCA in the form of cash and other assets, such as motor vehicles, parts, equipment, computers, food, beverages, books, records, reports, documentation, and other information at or derived from SSA and WCA.

96.     Periodically during and at the close of each Race Night, Tiffany is to provide or deliver to the Money Room or the person in charge of the Money Room all cash and others of payment made for the Companies' goods and services.

97.     While working for the Companies and, secretly on behalf of the Enterprise, at the close of business and at other times, Tiffany took cash profits and other property for the exclusive use of the Enterprise.

98.     From in or about August 2010, while working for the Companies and, secretly on behalf of the Enterprise, Tiffany, Linda, and Marianne have had and continue to have exclusive possession of and control over the original books, records, reports, and documentation relating to SSA and WCA, as well as the manner in which the foregoing are prepared, maintained, stored, transmitted, and communicated to Julie and third parties.

99.     From in or about August 2010, while working for the Companies and, secretly on behalf of the Enterprise, Tiffany took and continues to take charge of collecting and possession of additional payments made to the Companies each Race Night, making the second deposit, going to the Counting Room at American Midwest bank, and calculating and documenting the total amounts paid in exchange for the Companies' goods and services each Race Night.

100.     In furtherance of certain schemes of the Enterprise, Tiffany took cash profits from the Companies.

101.     For example, on June 8, 2012, Tiffany stole $1,500 in cash for the exclusive benefit of the Enterprise.

102.     In furtherance of the Enterprise's scheme to steal and defraud and on behalf of the Enterprise, Tiffany created a fraudulent document concealing the Enterprise's theft by indicating only the Companies had taken in $1,500 less in revenue on June 8, 2012.

103.     In or about December 2012, Tiffany willingly accepted property, including televisions, iPods, and other electronics, knowing it had been purchased with money stolen by the Enterprise.

104.     Since August 2010, in furtherance of the Enterprise's schemes to steal and conceal from and deceive Julie, Tiffany communicates with Julie about the operations, finances, preparation of tax returns, bank accounts, money, profits, and other matters relating to the Companies and money and other property belonging to Julie via United States Mail, electronic mail, telephone, facsimile, and text and causes to be transmitted money from Illinois to Julie in Florida.

105.     As it suits the Enterprise's purposes, Tiffany refuses to provide information to Julie or respond to various communications from Julie via telephone, email, and text concerning the same topics.

### *Charlie Olson*

106.     Charlie is Tiffany's boyfriend.  Charlie and Tiffany have a daughter named Natalie. Charles lives with Tiffany and Natalie.

107.     In furtherance of the Enterprise's schemes, Linda hired Charlie as an employee of SSA and WCA.

108.     From time to time, Charlie is responsible for developing illegal schemes on behalf of the Enterprise.    Charlie also knowingly and willingly accepts instructions from Linda and Tiffany and executes schemes on behalf of the Enterprise.

109.     Since August 2010, Charlie has access to and steals and conceals on behalf of the Enterprise the profits and other property derived from SSA and WCA and belonging to Julie, including money, motor vehicles, parts, equipment, food, and beverages.

110.     In or about December 2012, Charlie willingly accepted property, including televisions, iPods, and other electronics, knowing it had been purchased with money stolen by the Enterprise.

### *Tiffany and Charlie*

111.     Beginning in August 2010 and continuing to the present, Tiffany and Charlie knowingly and willingly have used and continue to use cash and other assets stolen or otherwise misappropriated by the Enterprise and belonging to Julie.

112.     For example, Tiffany and Charlie used money stolen by the Enterprise to pay for improvements to their home, such as renovations or repairs to the basement, construction of a driveway, and a building of a patio; and to purchase 3 snow mobile, 3 race cars, a chaise, a truck, and a car hauler, all of which cost approximately $100,000 or more.

113.     On his Facebook page, Charlie posted pictures of the 3 cars, 3 snow mobile, chaise, truck, enclosed car hauler, and kegs of beer stolen, accompanied by text messages confirming he and Tiffany used to purchase the items profits stolen by the Enterprise.

114.   For example, next to an image of the chaise, Charles commented: "thanks tiff and sycamore speedway . . u are the greatest"; and, next to an image of the patio at his and Tiffany's home, Charles commented: ". . . didn't u here sycamore speedway paid for it . . . lmao. . ."

115.   As another example, since at least August 2010, the Enterprise developed a scheme to conceal from Julie certain amounts of stolen money and other property.

116.   In furtherance of that scheme, on behalf of the Enterprise, Tiffany and Charles have stored at the home they share tens of thousands of dollars stolen by the Enterprise.

117.   Each member of the Enterprise willingly intended for and was aware of the scheme to conceal and Tiffany and Charlie's execution of that scheme.

118.   In 2012, the Enterprise became concerned Julie might discover its theft, fraud, and concealment.

119.   The Enterprise devised a new scheme to conceal its misconduct from Julie.

120.   In furtherance of the Enterprise's new scheme, it decided Tiffany and Charlie should no longer maintain possession of the Enterprise's cache.

121.   The Enterprise devised and executed a scheme whereby Tiffany and Charlie moved the stolen money into multiple safety deposit boxes at various banks.

122.   As another example, on or before September 3, 2012, the Enterprise devised a scheme to steal kegs of beer purchased by the Companies.

123.   In furtherance of this scheme, on or about September 3, 2012, Linda, Tiffany, and Charlie stole twenty kegs of beer from the SSA's Maple Park property and had the kegs delivered to the home of Tiffany and Charlie.

124.   Tiffany and Charlie willingly accepted the 20 kegs of beer, knowing it was stolen.

125.     Tiffany and Charles gave the beer to guests at a Labor Day party they threw and members of the Enterprise attended on September 3, 2013.

126.     The Enterprise sold tickets to this party at a price of $25 each.

### Samantha Gerace

127.     Samantha is Linda's and Dan's daughter.

128.     In furtherance of the Enterprise's schemes, Linda hired Samantha as an employee of SSA and WCA.

129.     Sam knowingly and willingly accepts instructions from Linda and Tiffany and executes schemes on behalf of the Enterprise.

130.     Since August 2010, Sam has access to and steals and conceals on behalf of the Enterprise the profits and other property derived from SSA and WCA and belonging to Julie, including money, food, and beverages.

131.     For example, each Race Night since August 2010, Sam is responsible for accepting and accepts money paid to the Companies at various stands. Sam puts the money into her pockets, wallet, purse, or Money Cans intending for it to be stolen by and stealing it for the Enterprise and concealing the money and schemes from Julie.

132.     As another example, at the end of each Race Night, Sam was responsible for purchasing cars for resale by the Companies to Zimmerman Scrap. On behalf of SSA, Sam was to use the cash from the Companies to pay for and obtain the titles to the cars, then resell the cars to Zimmerman Scarp, and provide to SSA all amounts received in payment for the junk cars.

133.     Beginning in 2010 to the present, acting on behalf of the Enterprise, Sam uses cash from the Companies to pay for and obtain title to junk cars, sells the junk cars to

Zimmerman Scarp, receives cash payment from Zimmerman cash, fails to provide any amount received from Zimmerman to SSA, and keeps the payments from Zimmerman Scrap.

134.    Sam works with the other members of the Enterprise, such as Tiffany, Linda, and Marianne to prepare to conceal this scheme and create fraudulent books, records and other documents.

135.    Concerned their own homes may be searched and in furtherance of the Enterprise's concealment, Linda and Tiffany instructed Sam to and Sam kept the book showing the number of cars purchased by SSA in her house.

136.    Although the SSA historically earned tens of thousands of dollars each year in profits from its resale of junk cars, neither the books, records, documents, reports, or returns reveal any money received from Zimmerman Scarp from 2010 to the present.

137.    In or about December 2012, Sam willingly accepted property, including televisions, iPods, and other electronics, knowing it had been purchased with money stolen by the Enterprise.

### *Brett Gerace*

138.    Brett is Linda's and Dan's son.

139.    In furtherance of the Enterprise's schemes, Linda hired Brett as an employee of the Companies.

140.    Brett knowingly and willingly accepts instructions from Linda and Tiffany and executes schemes on behalf of the Enterprise.

141.    Since August 2010, Brett has access to and steals and conceals on behalf of the Enterprise the profits and other property derived from SSA and WCA and belonging to Julie, including money, food, and beverages.

142.    In or about December 2012, Brett willingly accepted property, including televisions, iPods, and other electronics, knowing it had been purchased with money stolen by the Enterprise.

**_Kelli Gerace_**

143.    Kelli is Linda's and Dan's daughter.

144.    In furtherance of the Enterprise's schemes, Linda hired Kelli as an employee of SSA and WCA.

145.    Kelli knowingly and willingly accepts instructions from Linda and Tiffany and executes schemes on behalf of the Enterprise.

146.    Since August 2010, Kelli has access to and steals and conceals on behalf of the Enterprise the profits and other property derived from SSA and WCA and belonging to Julie, including money, food, and beverages.

147.    For example, on various Race Nights since August 2010, Kelli is responsible for accepting and accepts money paid to the Companies at various stands. Kelli puts the money into her pockets, wallet, purse, or Money Cans intending for it to be stolen by and stealing it for the Enterprise and concealing the money and schemes from Julie.

148.    In or about December 2012, Kelli willingly accepted property, including televisions, iPods, and other electronics, knowing it had been purchased with money stolen by the Enterprise.

149.    In furtherance of the Enterprise's schemes, Linda and Tiffany instruct Kelli to prepare the books, records, reports, and documentation relating to SSA and WCA in a manner in which Kelli knows is inaccurate and false

150.    From in or about 2012, Kelli willingly executes the Enterprise's schemes concerning the books, records, reports, and documentation pursuant to Linda and Tiffany's instructions.

### Marianne Anderson

151.    Marianne is Linda's friend.

152.    Marianne is a certified public accountant.

153.    In furtherance of the Enterprise's schemes, Linda hired Marianne to provide accounting advice and other services in exchange for payments and other benefits derived from the Companies.

154.    On behalf of the Enterprise, Marianne's role is to devise and Marianne does devise different schemes to steal, defraud, and conceal the misconduct of the Enterprise.

155.    Since August 2010, Marianne has had and continues to have access to the books, records, reports, documentation, and other information at or derived from SSA and WCA.

156.    In furtherance of the Enterprise's schemes, since August 2010, Marianne has assumed and continues to have control over the manner in which the books, records, reports, documentation, and other evidence relating to SSA and WCA and Julie are prepared, maintained, stored, transmitted, submitted, and communicated to Julie and third parties.

157.    Marianne directs other members of the Enterprise how to steal, defraud, and conceal by preparation and transmission of intentionally false and fraudulent books, records, reports, documentation, and other information concerning SSA and WCA and money and other assets rightfully belonging to Julie.

158. At least by 2012, Marianne is responsible on behalf of the Enterprise for advising and instructing Linda and Tiffany how to manipulate books, records, and other documents to perpetuate and conceal the theft of the Enterprise.

159. For example, Marianne advised Linda and Tiffany to cause the Companies' books, records, and other documents to be prepared so as to reflect at least a minimal profit over the amounts shown as spent by the Companies to purchase the goods the Companies re-sold.

160. From in or about August 2010, Marianne has been responsible for and does prepare the tax returns of the Companies.

161. In furtherance of the Enterprise's schemes and pursuant to the scheme devised by Marianne, Linda, and Tiffany, Linda signed the Companies' 2010 tax returns as the "managing member" of SSA and WCA.

162. In furtherance of the Enterprise's schemes and pursuant to the scheme devised by Marianne, Linda, and Tiffany, Linda signed the Companies' 2011 tax returns as the "President" of SSA and as "managing member" of WCA.

163. In furtherance of the Enterprise's schemes and pursuant to the scheme devised by Marianne, Linda, and Tiffany, Marianne signed and mailed Julie a copy of the Companies' 2010 tax returns.

164. In furtherance of the Enterprise's schemes and pursuant to the scheme devised by Marianne, Linda, and Tiffany, Marianne emailed Julie a copy of the Companies' 2011 tax returns.

165. In furtherance of the Enterprise's schemes, since August 2010, Marianne advises and instructs Linda and Tiffany how to account for earnings and profits so as to facilitate the Enterprise's schemes to defraud and steal and conceal from Julie.

22

166.   On behalf of the Enterprise and to conceal the misconduct of the Enterprise, Linda, Tiffany, and Marianne agreed they each would provide Julie with as little information as possible and none of them would provide Julie accurate information relating to earnings and profits.

167.   For example, on January 17, 2013, Julie (in Florida) emailed Marianne (in Illinois) requesting all of the Companies' quarterly reports for 2012 and other financial information, including expenses, profits, and losses.

168.   On January 18, 2013, Marianne (in Illinois) emailed Julie (in Florida) intentionally providing Julie with false information on behalf of the Enterprise.

169.   Marianne emailed Julie that she would send her copies of fourth quarter and year-end information.

170.   Thereafter, concerned the documents might reveal execution of its prior schemes to steal, the Enterprise decided to prevent Julie from accessing such documents in an effort to conceal its schemes to steal and defraud.  In furtherance of this goal, the Enterprise devised a scheme to keep information from Julie.

171.   In furtherance of that scheme, Marianne ultimately refused to provide Julie with the first three quarterly reports for 2012 or any other financial information.

172.   On January 24, 2013, Marianne emailed Julie copies of the Companies' fourth quarter financial information which fraudulently concealed the Enterprise's theft and other misconduct.

### *Linda's and Tiffany's Direct Conduct Relating to Third Parties*

173.    Since August 1, 2010, as employees of the Companies, Linda and Tiffany are to provide and accurately account for all of the payments made by third parties in exchange for the Companies' goods and services.

174.    Instead, Linda and Tiffany act on behalf of the Enterprise, stealing for the exclusive use of the Enterprise cash paid by third parties in exchange for the Companies' goods and services.

175.    To the extent non-Enterprise employees of the Companies have control over cash, Tiffany and Linda lie to those employees as to reasons why they need the cash and instruct those non-Enterprise employees to provide Linda and Tiffany with cash for the fraudulent reasons Linda and Tiffany provide.

176.    For example, on July 21, 2012, the Companies owed $200 as payroll to their employees. Knowing of the Companies' $200 obligation, Linda instructed another employee to leave $400 for Linda in twenties, contending she needed it for the same payroll.

177.    In furtherance of these schemes, Linda and Tiffany fail to account for and concealed and cause to be concealed these amounts.

178.    As part of its legitimate business, SSA sells parts, metal, scarp, and other items to third parties, such as Zimmerman Scrap, Inc. and Paul's Junk Yard.

179.    While working for the Companies and secretly on behalf of the Enterprise, Linda and Tiffany requested third-party companies to which SSA sold goods make small portions of their payments by check and the majority in cash provided directly to Linda and Tiffany for the benefit of the Enterprise.

180.    In furtherance of these schemes, Linda and Tiffany conspired and agreed that, if Julie asked Tiffany whether payments had been made, Tiffany intentionally would communicate false information to Julie in order to effectuate and conceal the Enterprise's schemes to steal and defraud.

181.    For example, on or about August 13, 2012, Julie emailed Tiffany inquiring whether payments had been received from Zimmerman Scarp or Paul's Junk Yard.

182.    On or about January 31, 2013, Tiffany emailed to Julie that all amounts from Zimmerman Scarp or Paul's Junk Yard had been deposited in the Companies' bank accounts. Tiffany emailed Julie that Zimmerman Scrap and Paul's Junk Yard had not paid any more for any of the Companies' good or services.

183.    Meanwhile, in furtherance of the Enterprise's scheme, Linda and Tiffany bribed, coerced, and/or conspired with Zimmerman Scrap by of benefits and services derived from the Companies to lie to Julie.

184.    Linda, Tiffany, and Zimmerman Scrap conspired and agreed that, if Julie asked Zimmerman Scrap about whether payments had been made, Zimmerman Scrap would communicate to Julie that it made no payments to the Companies.

185.    On or about January 29, 2013, Julie emailed Zimmerman Scrap inquiring about payments made. Zimmerman Scarp responded that it had no records of any payments made the Companies.

186.    In or about 2011, the Enterprise developed a scheme to steal for itself all profits earned by the Companies resulting from payments made by third party, Farm Films, LLC.

187.    In or about 2011, the Companies entered into an agreement with Farm Films, LLC pursuant to which it filmed the motion picture *At Any Price* at the Companies' Maple Park property for fees.

188.    As part of its preconceived scheme to steal the profits, the Enterprise devised a scheme to conceal the theft.

189.    During 2011 and 2012, Linda and Tiffany bribed or coerced Farm Films and its related entities to make only a small portion of its payments by check by way of benefits and services derived from the Companies.

190.    On behalf of the Enterprise, Linda and Tiffany instructed Farm Films to and Farm Films did make the majority of its payments in cash directly to Linda and Tiffany.

191.    In furtherance of this scheme, Linda and Tiffany agreed on behalf of the Enterprise that, if Julie asked what payments had been made by Farm Films, Linda and Tiffany would communicate to Julie that the only amounts were the checks deposited in the Companies' bank account at American Midwest Bank.

192.    On or about August 13, 2012, Julie emailed Tiffany asking what amount Farm Films has paid for use of the Companies' Maple Park property.

193.    On or about January 31, 2013, Tiffany emailed Julie that all checks had been deposited in the Companies' bank account.

194.    Meanwhile, in furtherance of the Enterprise's scheme, Linda and Tiffany bribed, coerced, and/or conspired with Farm Films by way of benefits and services derived from the Companies to lie to Julie.

195. On behalf of the Enterprise, Linda, Tiffany, and Farm Films agreed that, if Julie asked Farm Films what payments it had made for use of the Companies' property, Farm Films would communicate to Julie it only paid those amounts made by check.

196. On or about January 29, 2013, Julie emailed Farm Films asking what amount Farm Films has paid for use of the Companies' property.

197. On February 18, 2013, Farm Films responded that it did not have any information.

198. On or about February 22, 2013, Julie emailed a different representative of Farm Films inquiring about payments made for use of the Companies' property. That same day, the representative for Farm Films responded, communicating to Julie that it only paid those amounts made by check. Farm Films copied Tiffany on its response to Julie.

199. In 2012 or 2013, the Enterprise developed a scheme to steal from and defraud Julie by causing the Companies to enter into an agreement with LaSalle Speedway.

200. In furtherance of this scheme and to conceal it from Julie, Linda and Tiffany refuse to inform Julie about the agreement and any resulting earnings or profits.

201. On behalf of the Enterprise, Linda and Tiffany falsified the Companies' earnings and profits to American Midwest Bank.

202. Since August 2010, Julie continues to repeatedly request via email that Linda and Tiffany provide her with access to the Companies' bank accounts. On behalf of the Enterprise, Linda and Tiffany refuse.

203. During October 2011, Julie used American Midwest Bank's website and sent emails to American Midwest Bank to obtain financial information Tiffany and Linda refused to provide to Julie.

204.    On October 31, 2011, American Midwest Bank mailed to Julie financial information Tiffany and Linda refused to provide to Julie.

205.    Thereafter, Tiffany discovered American Midwest Bank had been providing Julie with bank statements through the mail.

206.    The Enterprise devised a scheme to stop Julie from discovering its misconduct.

207.    In or about February 2012, Tiffany contacted American Midwest Bank and directed them to stop mailing statements to Julie.

208.    Tiffany emailed Julie that she would send Julie the statements so that Julie was not to seek to obtain information directly from the bank.

209.    Tiffany sent via email to Julie certain accountant statements from American Midwest Bank dated January 31, 2012.  Tiffany did not send Julie statements for any other period.

210.    Julie repeatedly requested Linda and Tiffany provide her with information and documentation relating to the Companies' earnings, profits, financial, and accounting information.

211.    For example, on August 13, 20 12, Julie emailed Linda and Tiffany requesting such information, including that related to the money received from Zimmerman and Farm Films.

212.    In furtherance of the Enterprise's schemes, on or about September 11, 2012, Tiffany sent a package via Federal Express to Julie in Florida which contained intentionally false, fraudulent, inaccurate and incomplete information relating to the Companies' earnings and profits, including sheets reflecting less money than was paid in exchange for the Companies goods and services on Race Nights, by Zimmerman Scrap, and by Farm Films.

213.     In furtherance of the Enterprise's schemes, on September 20, 2012, Tiffany sent Julie a package via the United Postal Service which contained intentionally false, fraudulent, inaccurate and incomplete invoices from the prior weeks' Race Nights. The information did not account for the amounts stolen but concealed those amounts.

214.     In furtherance of the Enterprise's schemes, on October 9, 2012, Tiffany sent to Julie at her Florida residence a package which contained intentionally false, fraudulent, inaccurate and incomplete information about amounts paid in exchange for the Companies goods and services from May through October 2012. The information did not account for the amounts stolen but concealed those amounts.

### *Linda's and Tiffany's Direct Conduct Relating to Companies' Documents*

215.     Tiffany and Linda have used their positions of authority and control over the Companies to conceal the Enterprise's schemes to steal from and defraud Julie.

216.     In or before August 2010, the Enterprise devised a scheme to conceal its theft and fraud from Julie.

217.     In furtherance of Enterprise's schemes and in an effort keep Julie from becoming aware of and investigating the theft and fraud, Linda or Tiffany are responsible for and do send or cause to be sent each month a check from Illinois to Julie in Florida.

218.     The check is drawn on the Companies bank accounts at American Midwest Bank in Illinois.

219.     Julie deposits the checks in her account at Third Federal Savings & Loan in Florida.  Julie uses those funds to pay the loan she took out from Third Federal Savings & Loan in Florida to purchase the Companies.

220. Linda and Tiffany engage in this conduct on behalf of the Enterprise and its intentions to communicate to Julie the Enterprise's false and fraudulent representations that each payment is half of the entire profits earned by the Companies each month.

221. As money is paid to the Companies in exchange for its goods and services, all amounts so paid are to be accurately recorded in the Companies' books and records.

222. Julie relies on the Companies' books and records to evaluate the performance of the Companies and the profits to which she is entitled.

223. Knowing of Julie's reliance, the Enterprise devises schemes to steal from and defraud Julie.

224. In furtherance of those schemes and on behalf of the Enterprise, Tiffany, Linda, and Kelli destroy and manipulate accurate or original Company books, records, documents and other evidence and create or cause to be created intentionally false and fraudulent versions.

225. Since August 2010, as a regular way of the Enterprise's execution of its illegitimate business, Linda, Tiffany, and Kelli routinely destroy or cause to be destroyed, revise or cause to be revised, and prepare or cause to be prepared intentionally false and fraudulent books, records, reports, and other evidence concerning the Companies and Julie's money and other property, to reflect substantially less than was and is paid in exchange for the Companies' goods and services.

226. Each member of the Enterprise intended for Julie to and Julie did rely on the false and fraudulent books, records, other documents and evidence concerning the Companies and Julie's money and other property

227. For example, in early July 2012, Julie told Linda and Tiffany that she would be going to the Companies' Maple Park property and, while there, intended to review the Companies' books, records, and other documents.

228. In response, Linda, Tiffany, and Kelli caused to be or themselves fraudulently rewrote the Companies' books, records, binders, ledgers, and other documents to reflect receipt of lower amounts and conceal the amounts stolen from and defraud Julie.

229. At or about the same time, to permit, perpetuate, and facilitate concealment of the Enterprise's misconduct, Linda and Tiffany caused and continue to cause the Companies to change the practice of using pen and, instead, use pencil to record the money paid in exchange for the Companies' goods and services.

230. Linda and Tiffany presented the fraudulent documents to Julie intending for Julie to rely on them. Julie did so rely.

231. When Julie reviewed the Companies' books and records in Maple Park in July 2012 and thereafter, she observed that the entries were written in pencil.

232. Once the Companies' documents were prepared using pencil, Linda, Tiffany, and Kelli would erase the amounts documented by the Money Room each Race Night and, later, write in a lesser amounts to conceal the theft and defraud.

233. Beginning at or about the same time, Linda, Tiffany, and Kelli caused and continue to cause the Companies to keep separate books and records so as to make easier the schemes to steal and defraud.

234.     Each member of the Enterprise was and is aware of the schemes and the execution of the schemes by Linda, Tiffany, Kelli, and Marianne concerning preparation of fraudulent books, records, other documents, reports, returns, and other evidence relating to the Companies and Julie.

235.     Each Defendant conspired to and intended for Julie to rely to her detriment on the fraudulent books, records, other documents, reports, returns, and other evidence relating to the Companies and Julie.

236.     On August 7, 2012, Julie met with Tiffany and Linda at the Companies' Maple Park administrative office. Julie asked Tiffany about the Companies' finances and requested that Tiffany begin faxing or emailing each week to Julie in Florida copies of the Companies' records and provide her with all codes and passwords for bank accounts, credit cards, quicken books, and the like. Julie told Tiffany and Linda that she intended to go to American Midwest Bank to obtain information and inquire about a safety deposit box possibly containing the Companies' profits.

237.     Tiffany went to American Midwest Bank, opened the safety deposit box, took out the stolen money, and gave the money to Dan for the enrichment of the Enterprise.

238.     Dan knew the money was stolen profits of the Companies. Dan willingly accepted it and stored it in a locker to which he had access at a police station in order to maintain the Enterprise's exclusive control of it and keep it from Julie.

### *Joint and Concerted Conduct of All Defendants*

239.     Beginning in or about August 2010 and continuing today, Linda and Tiffany have been and continue to be the masterminds of the scheme, the goal of which was to steal from and defraud Julie and use the money for the benefit of the Enterprise.

32

240.    On behalf of the Enterprise, Linda and Tiffany made decisions about how to manage and carry out the theft and fraud by the enterprise.

241.    Linda used and continues to use her role as co-owner to effectuate and perpetuate the Enterprise's schemes.

242.    Tiffany used and continues to use her role as manager to effectuate and perpetuate the Enterprise's schemes.

243.    Each member of the Enterprise was aware of and willingly agreed to and did participate in its schemes to defraud, steal, and conceal.  Each member of the Enterprise continues to do so today.

244.    Each member of the Enterprise knowingly and willingly accepted and used funds or other property they knew had been stolen by the Enterprise

245.    In furtherance of and to perpetuate the Enterprise's, each member of the Enterprise agreed not to and did not reveal the truth about the schemes to Julie. Each member continues to do so today.

246.    Each member of the Enterprise frequently participated and continues to participate in meetings in person and by telephone and text.  The purpose of the meetings is to devise and conspire to commit various schemes, to participate in, perpetuate, and conceal schemes, to protect the Enterprise  against Julie's efforts to recover what has been stolen and concealed from her, to otherwise enrich the Enterprise, and to protect the Enterprise.

## COUNT ONE: SUBSTANTIVE RICO VIOLATION

### *Against All Defendants*

247.  Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

248.  Beginning in or about August 2010 and continuing to the present, each of the Defendants came together as a group of individuals and agreed to and did associate together for their common purpose of using the legitimate business of SSA and WCA to steal and conceal their theft from Julie in violation of 18 U.S.C. § 1962(c).

249.  The purposes for which the Enterprise exists are criminal.

250.  The Enterprise knowingly and willing conspired to and did devise multiple schemes to defraud, steal from and conceal from Julie.

251.  The Enterprise has existed for nearly three years and continues to exist as of the date this Amended Complaint is filed.

252.  The Enterprise constitutes an open-ended RICO enterprise.

253.  Separately and distinctly from their legitimate relationship with the Companies, Linda Gerace, Daniel Gerace, Tiffany Gerace, Charles Olson, Samantha Gerace, Brett Gerace, Kelli Gerace, and Marianne Anderson are associated in fact for the illegitimate purposes of the Enterprise.

254.  The Enterprise threatens to continue and repeatedly cause injury to Julie in the future.

255.  The Enterprise is organized and operates in in a manner amenable to hierarchal structure.

34

256. As its regular way of doing business, the members of the Enterprise primarily look to Linda and Tiffany to voluntarily and intentionally devise the day-to-day misconduct and schemes to defraud and steal and conceal and otherwise engage in predicate acts, to plan the manner in which the Enterprise engages in misconduct and executes its schemes, instruct the other members of the Enterprise to and the manner in which to steal, defraud, conceal, and engage in other illegal conduct by way of their respective positions at the Companies, including how to use interstate forms of communication, such as telephones, email, text, and mails for purposes of communicating with other members of the Enterprise, with Julie, and with third parties, as well as executing the Enterprise's schemes, and otherwise instruct all other members of the Enterprise how to participate in and perpetuate the illegitimate goals of the Enterprise.

257. Operating as a single unit, all members of the Enterprise engage in misconduct and schemes to accomplish the purposes of the Enterprise.

258. The Enterprise uses the cash and other property it steals for the collective benefit of the Enterprise.

259. Each Defendant shared and continues to share in the profits of the schemes devised and/or executed by the Enterprise.

260. As its regular way of conducting itself, each member of the Enterprise conspires to and does provide to Julie and third parties intentionally false and misleading information relating the cash and other property stolen by the Enterprise.

261. As a regular way of conspiring to execute and executing the various schemes of the Enterprise, each member the Enterprise commonly communicated with other members of the Enterprise via telephone, email, and text.

262. As a regular way of conspiring to execute and executing the various schemes of the Enterprise and under the guise of operating the legitimate Companies, Linda, Tiffany, and Marianne secretly acted on behalf of the Enterprise and commonly transmitted to and communicated with Julie concerning intentionally false information via telephone, facsimile, email, text, and mail in order to steal various amounts of money and other property from Julie, as well as to perpetuate and conceal the Enterprise's different schemes in furtherance of the Enterprise's goal to enrich itself.

263. With respect to documents prepared for reporting purposes, the Enterprise looks to Marianne to devise its schemes; instruct other members how to execute various parts of the schemes to steal, conceal, and defraud, to prepare fraudulent documents to supporting information to be provided to Julie, reporting agencies, and other third parties; and to prepare documents, reports, and other evidence.

264. As part of the Enterprise's regular manner of executing its various schemes, Marianne knowingly and willing uses the fraudulent supporting documents and other evidence to prepare other fraudulent materials and transmit them via email, facsimile, and US Mail to Julie, various state and federal agencies, and others.

265. The Enterprise destroys evidence and creates fraudulent books, records, documents and other evidence, and transmits the foregoing to Julie and others.

266. The foregoing racketeering activities in which the Enterprise engaged and continues to engage constitute predicate acts, including violations of 18 United States Code, § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud).

267. The Enterprise also devises and engages in schemes to commit and continues to commit predicate acts of embezzlement in violation of 720 Ill. Comp. Stat. Ann. § 5/16-1(b).

268.    With the specific intention of defrauding Julie, the Enterprise willfully conspired and agreed to participate in schemes to misappropriate and misappropriated to its own use the money and other property belonging to Julie that she had entrusted to the care of the members of the Enterprise in their respective roles as co-owner (Linda), employees (Dan, Tiffany, Charlie, Brett, and Sam), and accountant (Anderson) for the legitimate Companies.

269.    In furtherance of and to conceal its schemes, the Enterprise transmitted to Julie via mail, facsimile, email, and text fraudulent documents and other evidence.

270.    The Enterprise intended for Julie to rely and Julie did rely on the false and fraudulent material intentionally created by the Enterprise.

271.    The Enterprise also commits the predicate acts of engaging in deceptive practices in violation of 720 ILCS 5/17-1.

272.    For example, on behalf of the Enterprise, Linda intended to defraud Julie to become a co-owner of the Companies at a time when Linda knew the Enterprise would use the Companies to execute illegal schemes of the Enterprise.  By way the deception, Linda on behalf of the Enterprise knowingly caused Julie to execute documents, such as applications and reports with the State of Illinois and County of Kane by which Julie incurred pecuniary obligations.

273.    The Enterprise also commits the predicate acts of engaging in deceptive practices in violation of 720 ILCS 5/17-50.

274.    For example, on behalf of the Enterprise, Linda, Tiffany, and Anderson knowingly accesses and cause to be accessed computers, accounting programs, and data with the intent of devising and executing the Enterprise's schemes to defraud and as part of its deception obtained use of computers and altered, deleted, and removed data relating to property belonging

to Julie contained therein in connection with the Enterprise's schemes to defraud Julie as described herein.

275.    On behalf of the Enterprise, Linda, Tiffany, and Anderson knowingly accesses and cause to be accessed computers, accounting programs, and data and obtain money and control over money and other property exceeding $50,000 in value belonging to Julie in connection with the Enterprise's schemes to defraud Julie as described herein.

276.    The Enterprise also commits the predicate acts of engaging in deceptive practices in violation of 720 ILCS 5/16-1.

277.    For example, on behalf of the Enterprise, each member of Enterprise knowingly obtains by deception and exerts unauthorized control over property belonging to Julie as described herein.

278.    For example, on behalf of the Enterprise, Linda and Tiffany obtain by threat to inflict physical and financial injury to Julie as described herein, control over money and other property belonging to Julie.

279.    For example, on behalf of the Enterprise, each member of Enterprise obtains control over money and other property knowing it to have been stolen or under such circumstances as would reasonably induce each member of the Enterprise to believe the money and other property were stolen.

280.    For example, on behalf of the Enterprise, each member of Enterprise intends to permanently deprive Julie of the use and/or benefit of the money and other property exceeding $100,000 in value belonging to Julie; knowingly uses and conceals the money and other property exceeding $100,000 in value belonging to Julie so as to deprive Julie of such use and benefit; uses and conceals the money and other property exceeding $100,000 in value belonging to Julie

knowing such use and concealment probably will deprive Julie permanently of such use and/or benefit.

281. The Enterprise also engages in predicate acts of intimidation in violation of Illinois Code Section 12-6 (720 ILCS 5/12-6).

282. For example, in or about May 2013, the members of the Enterprise intended to cause Julie to withdraw her complaint and stop interfering with the schemes of the Enterprise.

283. During April, May, and June 2013, Linda and Tiffany directly communicated with Julie via oral conversations threats to expose Julie to collective hatred, contempt, and ridicule by the members of the Enterprise, the community in which the members of the Enterprise live, the third-parties with which Julie did business, and Julie's family.

284. On behalf of the Enterprise, Linda and Tiffany indirectly communicated with Julie through third-parties, threats to inflict physical harm on Julie.

285. For example, Linda and Tiffany indirectly communicated with Julie via a former long-time judge of Kane County and members of the Kane County Police Department threats to accuse Julie of non-compliance with an order of the Kane County Court and other offenses, as well as threats to fine and imprison Julie.

286. On May 4, 2013, in an effort to intimidate Julie and coerce her to stop interfering with their illegal schemes, Linda and Tiffany contacted the Kane County Sheriff's Department and intentionally and fraudulently reported to that Julie was stealing from the Companies, was hurting Company employees, and was violating a restraining order.

287. The Enterprise also communicated indirectly with Julie via telephone in June 2013. At a time when Linda, Tiffany, and Dan, believed Julie was staying with her sister, the Enterprise caused someone to call Julie's sister in an effort to intimidate and coerce Julie and her

sister. The caller threatened to get Julie's sister terminated from her employment with the Kane County Court if she did expel Julie from her home.

288.   On or about April 17, 2013, Charlie and Tiffany intentionally drove quickly toward and nearly hit Julie with a large, black truck as Julie left the WCA, intending to threaten, intimidate, and scare Julie and accomplishing those goals.

289.   On April 22, 2013, on behalf of the Enterprise, Brett indirectly communicated with Julie via a posting on a relative's Facebook page threats to expose Julie to hatred, contempt, and ridicule.

290.   On or about April 29, 2013, on behalf of the Enterprise, Charlie indirectly communicated with Julie via his Facebook page threats to bring about a boycott by those who might otherwise patronize the Companies and generate profits to which belong to Julie.

291.   The Enterprise also is organized and operates in a manner amenable to consensual decision making.

292.   The Enterprise also conspires to and engages in a number and variety of other predicate acts, including by way of each member on multiple occasions during the continuing existence of the Enterprise transmitting fraudulent information concerning its various schemes via mail, facsimile, email, text, telephone, and private carrier to Julie and others.

293.   In furtherance of its purposes, the Enterprise comes together as a unit at meetings in person, via telephone, and other forms of communication to expressly plot in advance of the Enterprise's crimes that the Enterprise would cover us its crimes by lying, destroying evidence, preparing false books, records, and reports to third-party banks and government agencies; to discuss and reach agreement concerning the development and status of Enterprise's schemes; and

to communicate about strategies concerning the manner in which the Enterprise will execute its schemes and other affairs of the Enterprise.

294.    These meetings of all members the Enterprise often take place at the home at which Sam resides.

295.    Linda and Tiffany were primarily responsible for scheduling the Enterprise's group meetings. The other members of the Enterprise then distributed Linda or Tiffany's message to other members of the Enterprise via cellular phone, email, and text message.

296.    In or about March 2013 and after Julie initiated this lawsuit, Linda, Tiffany, and Dan specifically threatened during a meeting of the Enterprise at the home of Linda and Dan to continue the Enterprise and never return any stolen money or other property to Julie.

297.    As a regular way of carrying out its schemes and engaging in its illegitimate business affairs, the Enterprise engages in predicate acts.

298.    Each false document prepared and false representation made by the Enterprise constitutes a distinct attempt by the Enterprise to defraud, steal from, and wrongfully misappropriate property from Julie the specific amount and/or property that was the subject of each act to which she had and has full and exclusive rights to possession and control.

299.    Each false and/or incomplete payment made by the Enterprise constitutes a distinct attempt by the Enterprise the specific funds that were the subject of each act to defraud, steal from, and wrongfully misappropriate property from Julie the specific amount and/or property that was the subject of each act to which she had and has full and exclusive rights to possession and control.

300.    Each predicate act in which the Enterprise conspired to and/or did engage constitutes a distinct attempt by the Enterprise to cause individual injury to Julie in the specific business and property of Julie's that were the subject of each act.

301.    Each of the number and variety of predicate acts in which the Enterprise conspired to engage and/or did engage caused and continue to cause multiple, independent, direct injuries to Julie in her business and property.

302.    There is no natural or other end to the Enterprise.

303.    The Enterprise will continue to conspire to and execute its illegal schemes unless and until prevented by this Court's intervention.

## COUNT TWO: CONSPIRACY TO VIOLATE RICO

### *Against All Defendants*

304.    Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

305.    Each of the Defendants willfully combined, conspired, and agreed to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

306.    Beginning in or about August 2010 and continuing to the present, each of the Defendants conspired and agreed to directly and indirectly participate in the conduct of the Enterprise.

307.    Beginning in or about August 2010 and continuing to the present, each of the Defendants knowingly and willingly conspired to, agreed to directly and indirectly, and did participate directly and indirectly in two or more predicate acts and conspired and agreed that other members of the Enterprise would participate directly and indirectly in two or more of predicate acts to carry out the schemes and accomplish the goals of the Enterprise.

308.     Each of the Defendants knowingly and willingly conspired to, agreed to, and did participate directly and indirectly in the Enterprise's schemes to commit predicate acts.

309.     As a regular way of conspiring to carry out and carrying out its schemes and engaging in its illegitimate business affairs, the Enterprise engages in predicate acts.

310.     Each predicate act in which the Enterprise conspired to and/or did engage constitutes a distinct attempt by the Enterprise to cause individual injury to Julie in the specific business and property of Julie's that were the subject of each act.

311.     Each of the number and variety of predicate acts in which the Enterprise conspired to engage and/or did engage caused and continue to cause multiple, independent, direct injuries to Julie in her business and property.

312.     There is no natural or other end to the Enterprise.

313.     The Enterprise will continue to conspire to and execute its illegal schemes unless and until prevented by this Court's intervention.

## **COUNT THREE: FRAUD**

### ***Against All Defendants***

314.     Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

315.     On and before June 30, 2010, Linda represented to Julie that the Companies would be managed and operated fairly between them and that all profits would be split equally between them.

316.     At the time she made the representation, Linda did not intend to keep it.

317.     Julie relied on Julie's representation, as well as those of every other Defendant who, while representing to Julie that they were conducting business on behalf of and in the best

interests of Julie and the legitimate Companies she co-owned with Linda, were actually conspiring and executing schemes to steal, defraud, and conceal on behalf of the Enterprise.

318.    Each Defendant kept their true intentions secret from Julie.

319.    All of the Defendants intentionally misrepresented and concealed the predicate acts of the Enterprise to maintain their employment at the Companies and prolong their ability to scheme and other predicate acts on behalf of the Enterprise.

320.    Julie was not aware of the Enterprise or each Defendant's secret intentions or misconduct.

321.    Julie did not discuss or otherwise reach any agreement with any Defendant concerning the Enterprise or their participation in the scheming and predicate acts on behalf of the Enterprise.

322.    By way of their false statements, each Defendant sought to induce and did induce Julie to permit each of them and the Enterprise as a unit to continue to defraud, steal, and conceal.

323.    Julie relied on the truth of the statements made by each of the Defendants and allowed them to continue in positions of access to and authority and control over her financial interests in and rights to the profits of the Companies.

324.    As a direct result of each Defendant's misconduct, Julie has suffered and will continue to suffer actual economic damages in excess of $500,000.

### COUNT FOUR: CONSPIRACY TO COMMIT FRAUD

#### *Against All Defendants*

325.    Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

326.    On and before June 30, 2010, each Defendant conspired to make intentionally false and fraudulent representations to Julie and induce Julie to rely on their fraudulent representations as described herein.

327.    Each Defendant conspired to intentionally misrepresent and conceal their misconduct, including, the predicate acts of the Enterprise, in order to induce Julie to permit them to maintain their employment at the Companies and misconduct of the Enterprise.

328.    Julie was not aware of the Enterprise or any of Defendant's conspiracies, secret intentions, or other misconduct.

329.    As a direct result of each Defendant's misconduct, Julie has suffered and will continue to suffer actual economic damages in excess of $500,000.

## COUNT FIVE: UNJUST ENRICHMENT

### *Against All Defendants*

330.    Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

331.    As described above, each Defendant took and continues to take without authority and wrongfully assumed control of, exercised dominion over, and converted to their use funds, property, and other benefits that rightfully belong to Julie.

332.    Julie is entitled to and has absolute and unconditional rights to immediate possession of the cash and other property taken by each Defendant.

333.    Julie has repeatedly demanded Defendants return the property. Each Defendant has refused.

## COUNT SIX: BREACH OF FIDUCIARY DUTIES

### *Against All Defendants*

334.    Plaintiff re-affirms, re-alleges, and incorporates each and every allegation and averment in the preceding and succeeding paragraphs as if fully set forth herein.

335.    As co-owner of the Companies, Linda owes Julie a fiduciary duties

336.    In violation of her fiduciary duties, Linda conspired to and did act in the best interest of herself and the Enterprise to the detriment of Julie as described herein.

337.    As a direct and result of Linda's breach of her fiduciaries duties, Julie has been injured and suffered and will continue to suffer actual economic damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for and order and judgment against Defendants Linda Gerace, Daniel Gerace, Tiffany Gerace, Charles Olson, Samantha Gerace, Brett Gerace, Kelli Gerace, and Marianne Anderson, jointly and severally, as follows:

   a.    Awarding Plaintiff her damages in an amount to be determined at trial and believed to be in excess of $500,000, treble damages, punitive damages, attorneys' fees and costs, and all interest thereon, in connection with her RICO claims;

   b.    Awarding Plaintiff her damages in an amount to be determined at trial and believed to be in excess of $500,000, punitive damages, and all interest thereon, in connection with her fraud claims;

   c.    Imposing a constructive trust over all assets, funds, properties, and revenues of Defendants obtained from Plaintiff during the course of their scheme to steal from and defraud Plaintiff;

   d.    Requiring Defendants to disgorge all monies paid by and non-monetary assets improperly acquired or utilized by Defendants from August 2010 through the present; and

   e.    Awarding Plaintiff such other and further relief as this Court deems appropriate.

Respectfully submitted,

By:    /s/ Stephanie A. Petersmarck
Stephanie A. Petersmarck (Attorney # 6278226)
Gould & Ratner LLP
222 North LaSalle Street, Suite 800
Chicago, IL 60601
Telephone: 312.236.3003
Facsimile: 312.236.3241

4827-9600-6420, v. 3

47

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2013, I electronically filed the foregoing with the Clerk of the Court suing the CM/ECF system which will send notification of such filings to the following:

Dan K. Webb
Timothy J. Rivelli
Gregory A. Ruehlmann, Jr.
Scott M. Ahmad
Winston & Strawn
35 West Wacker Drive
Chicago, IL  60601

Harold E. McKee
Lauren P. Shannon
Riorday McKee & Piper, LLC
20 N. Wacker Drive
Suite 910
Chicago, IL  60606


/s/ Stephanie A. Petersmarck


4836-4917-0708, v. 1